Thank you, and may it please the Court. I'm Chris Landau, and I'm here today for Raytheon. I'd like to reserve five minutes for rebuttal. The district court below held on summary judgment that plaintiffs unambiguously vested in the right to premium-free health insurance until age 65 under their Collective Bargaining Agreements, or CBAs. That holding is wrong for two basic reasons. First, when talking about health insurance, the CBAs at issue here, by their terms, send you over to the employer's health care plans. So you can't determine whether rights vested under the CBAs without looking at the plans. And second, when you then look at the plans, you find provisions that allow the employer to do what was done here. So long as it's consistent with the CBA. Absolutely, Your Honor. So we've got a little circle. Well, Your Honor, let me make one thing very clear. It is a little bit tricky because there are two sets of plans fundamentally here. You've got the early plans, which are the legacy Hughes plans, which are the 94 and 97 plans. Then you have the Raytheon plans, which are the 9903 plans. I think the one that he's referring to, the 94 and 97 plans, so that we can deal with separately, they have that little proviso-backed acceptance provided in the collective bargaining agreement, essentially. That's correct, Your Honor. That's correct. And is the 2003 plan relevant here for anything except the fact that it purports to change this contribution provision? It's not applicable, as I understand it, to any of the retirees. Well, Your Honor, the new or the class. The class consists of people who retired under plans, under CBAs in 1990, 1993, 96 and 99. Right. So the 2003 plan is, all it does is purport to change things, but it isn't the plan under which any of these people retired. Well, they might have retired. The new plan took effect, the new CBA took effect in 04. So I think if somebody retired under a- January 1, 04, right? Excuse me? January 1, 04, I think. Yes. But, again, at least the 90, 03 plan and the 99 plan are really the same in having very different plan provisions. But I just want to clarify that the 03 plan is irrelevant for these purposes. Well, Your Honor, again, I think it all depends when particular people retired, because you have to look at the combination of the CBA they retire under and what plan was in effect at the time of that CBA. Because, again, the CBAs send you to the plan, so you need that combination. And, again, I think the- 99 and 03 are essentially the same language as to the plan, is that right? Exactly. So let's go back to the original. What does that mean, except as provided by any agreement with a collective bargaining agent? Your Honor, I think that is one of those provisions that lawyers put in to say, look, we reserve the right to alter or amend, except to the extent that we can't alter or amend. In other words, the plans have to be accurate. There are ERISA accuracy requirements. And I think what that is doing is saying, look, there may be provisions in CBAs that we cannot amend because they do create vested rights. That provision itself doesn't create any vested rights. One thing that's very important to keep in mind- But what it recognizes is that there is exactly what you just said, that if the agreement sets the terms, it can't be overridden by a plan. Well, it does create a vested right. But, again, I think the question is, Your Honor, it says this. I mean, I think we have to be very specific on the language of that provision. It says the employer reserves the right to alter, amend, modify, revoke, or terminate in whole or in part the plan, except as provided in an agreement with a collective bargaining agent. So what that is doing, the question is, then, what is it in the collective bargaining agreement that modifies the right or that limits the right to amend or terminate? The other side, plaintiffs here, have pointed to the durational provision itself and say that itself is a limitation on the right. We've pointed to many cases that reconcile durational provisions with reservation of rights provisions, so there's no necessary inconsistency between having a durational provision and a reservation of rights provision. It's true, although in those cases it was cleaner because you have a durational provision over here, and then you have the plan with the reservation of right, but it didn't really refer back to the original or the other document. Alito, that's fair enough, Your Honor, but let me add this. I think the provision J4 of the CBAs is very important because that creates a rule of construction that says if there's any inconsistency between the plan and the CBA, the CBA will control if it provides so specifically. So it basically sets forth a clear statement rule. And I think when you combine that, I don't see in here, our position is that there is not a clear statement that is specifically that the durational provision in and of itself is not a clear statement that the right to alter or amend is limited.  Sotomayor, let me just get your construction. I could read this potentially two ways. One is I could read it broadly, which would mean you get the right to amend unless the collective bargaining agreement, you know, provides you some specific rights. Or your way is to say, as I understand it, unless the collective bargaining agreement actually says you can't change this. And I think the latter construction, Your Honor, is supported by J4 of the CBA, which again sets forth, says nothing herein shall change any provisions of the group benefit plans provided under this Article 13 as currently in effect other than those changes specifically referred to herein. Let me make one point, Your Honor. Again, I think this whole issue that we were talking about – I'm not really understanding that point or how that provision even has anything to do with this. I mean, my understanding of that provision is it's simply – it's sequential. It's essentially saying this agreement – what's currently in effect is what's in effect on the day that the agreement is signed, it seems to me is what they mean. And that we're not changing anything that was there before this agreement unless we say so. Your Honor, I don't see that temporal limitation in the language here. That's currently. Well, nothing herein shall change. Currently is the day the thing was signed. Right. But again, Your Honor, at a broader level, even if you had the circularity issue, Your Honor, even if we were wrong in terms of the effect of this, at the very least, this is not unambiguous their way. I think what you're identifying maybe is a problem saying, well, look, you get – the plan – the CBA sends you to the plans, the plans send you back to the CBAs. Even if that's not unambiguous in our favor, I don't see any way in which that is unambiguous in plaintiff's favor either. Let me back up for just a minute. I think the language in the various CBAs is as follows, and let me read it to you. The employer agrees to continue to provide the comprehensive medical plan coverages for which they were covered while active employees until attaining 65 and shall likewise continue the same comprehensive medical plan coverages for his or her eligible spouse until 65. The key to me is what does the word coverage or coverages mean? Because they've said we'll give you the same coverage until you're 65. That's what the CBA says. Correct, Your Honor. And we – So I look at a couple of letters, in fact, three letters, sent – maybe the most telling one is the one sent to Mark Argraves in 2002 by Raytheon. It says – and this is at SCR 13 if you want to find it. I had it right here, Your Honor. You are currently eligible for company-paid medical coverage. You and your eligible dependents will continue to be covered under the same medical coverage you had as an active employee. Well, that first sentence refers to company-paid medical coverage, and then it says you get the same coverage. That says to me – I mean, what you're fighting about is not whether you get only a co-pay of this or a co-pay of that. What you're fighting about is whether or not the company is going to continue to pay it as it has paid before. This says to me that Raytheon itself is construing that language and saying we're going to continue to pay as we have before. Oh, Your Honor, we're not – This does not seem to be a very hard case. Oh, well, Your Honor, I certainly hope I can change your mind on that during my limited time here. I think the sentence you actually read is helpful to us, because it actually says you are currently eligible. It doesn't say that you are vested in this. Currently is a language that is – And would you read the next sentence? Right. You will continue to – Continue. And then if you turn the page to SCR 14, it says at the end of the last paragraph, Raytheon hopes to continue the plans, but its customary and such plans, the right to alter, suspend or terminate the plans in whole or in part at any time for any reason is reserved to Raytheon. This information is not intended to contain the complete description of the plans. It cannot modify or affect the plans. I read that, and it doesn't say anything about changing the coverage. Okay. Let's – one final point on this letter, that this is extrinsic evidence, of course. And the district court said expressly, I'm not considering extrinsic evidence because I find that the CBAs are unambiguous here and the plans are irrelevant as a matter of law because they can't supersede the CBAs. Well, I'm afraid I agree with that. But if we were to find it ambiguous, this letter, to my mind, helps the argument of the plaintiff. Well, Your Honor, again, there are issues with looking at extrinsic evidence, even one letter. I mean, the district court – There are three letters. Well, okay. This is not the complete record in this case. But again, let me go to your more fundamental point, Your Honor. You said, well, you get the coverages. Coverages is, if anything, a narrower word than benefit in ordinary parlance. You talked about benefits are generally what you get from your employer in addition to your salary. You get benefits, whether that be a parking space, whether that be a turkey every Thanksgiving, whatever. Those are considered benefits in ordinary parlance. Coverage is a narrower concept. Coverage is what risks – it's an insurance concept. Benefits is a more generic concept. Coverage says what risks are you insured against and who's insured against them. Sotomayor, let me get to a question that I had. If you distinguish between benefits and coverage, what is the provision in the plan, in your view, that provides the payment for that coverage? Because the provisions you've been talking about now, leaving aside the extrinsic evidence, don't talk about who's going to pay for that. Right. Where do those emanate in the plan? Well, let me say one very important thing that, again, I think I got sidetracked before I finished. We were talking about the two sets of plans. The 99 and 03 Raytheon plans specifically address the issue of who pays for the coverage. Right. But we're talking now in the 94 and 97 plans, the question I want to know is where do you get the payment obligation? Well, the plans themselves, in the terms of the plans, they don't speak to the issue of payment specifically, but they say the employer reserves the right to alter, amend, or terminate the plan in whole or in part. That, again, would encompass the payment. If I sign up for this thing, how do I know the employer is going to pay for my full coverage? Well, the employer has said, let's go back to D-1, because I think Judge Fletcher is correct that D-1 is the source of employee rights. That says you get the coverages for which you are entitled as active. So that then says to you, what are those coverages, okay? Then you go to A-1 is what says the employees get to participate in the plan. This is the actives, subject to the terms of the plan. So that from the very beginning, the right to participate in the plan is subject to the terms and conditions of the plan. But I guess I'm stuck on that. Answer my question. Yes. Yes. That's where I am. Yes. I understand, you know, we've been bouncing around this plan as much as you have, and I've diagrammed it. I've looked at every word in it. I'm just trying to understand where does the payment obligation come from? Because I think it will affect how one might analyze 99 and 2003 also, but I want to know where to look. Your Honor, the payment obligation that they are referring to here comes from J-1 of the CBAs. It's a CBA obligation. It's not a plan obligation. They're rooting their right that is asserted in this case in the CBA. And so that's J-1. That's the provision that says the employer agrees to pay the premiums for a number of different plans. And when it talks about the comprehensive medical plan, it has an open paren subject to the provisions of Article 13, Section A, which, again, refer you back to the terms of the plan, the premiums for the coverages. Just looking at that, that suggests that coverages itself doesn't include the premiums for the coverages, because we agree to pay the premiums for the coverages, which is consistent with the ordinary view that we can pay the premiums for a certain degree of coverage. Sotomayor, which you might have gotten to, was payment obligation comes from the CBA. Is that accurate or not? Yes, Your Honor. And then the CBA, again, the architecture of this case is the payment obligation that they're asserting in this case, that they're asserting a vested right to, comes from the CBA. And the point here is, and they basically say that's the end of the story. Our point is, the payment obligation that comes from the CBA is always inherently linked to the reservation of rights provisions in the plan. Yes, but the reservation of rights, this is what I was going to say. The reservation of rights, the subordination clause, which gets you to the reservation of rights clause. It's one of the things, Your Honor, that gets you there. I'm sorry? It's one of the things that gets you there. That was one of the things in the panel. Well, tell me what else does after I ask this question. Fair enough, Your Honor. The CBA says that they're subject in every respect to the terms of the applicable plan documents, right? Yes, Your Honor. And then what does the reservation of rights clause say? Let's say the earlier one. What does it say? Well, the earlier one says, we reserve the right to alter or amend the plan subject to the acceptance of an idea. This is my question. Is the payment obligation or promise to which Judge McEwen was referring in the plan no, right? Well, Your Honor, the you are you operate under a plan. You get your benefits are provided under a plan. Right. The benefits are, and you choose your coverages, but the payment, the question of how much of that's going to be paid for, is not in the plan. Well, Your Honor, again, with the preservation of rights, it could be. Is that right, yes or no? Your Honor, the reservation of rights, it's not. That's not what I asked you. I asked you whether the obligation to pay all, some, or none of the whatever coverage you're getting is in the plan. The obligation to pay is not rooted in the plan. Right. The reservation of rights, however, says we can amend the plan in whole or in part. So therefore, that means you can add to the plan. But it was never in the plan, right? Yes, it is, Your Honor. In sections 5.1 and 5.2 of the 9903 plans, it specifically addresses contributions. And it says the employer has sole discretion over contributions. That's a really critical point that was not in the panel's first opinion. With all respect, sections 5.1 and 5.2, this is very important, at ER 166 to 167 and 173 to 74, specifically address the issue of contributions to health care premiums. They say that, quote, the plan shall be funded by employer and participant contributions in amounts determined by the employer, unquote. And, quote, participants' contributions shall be subject to change by and in the sole discretion of the company. I think you are asking me, well, where is the rights conferring provisions in the plan? And what I'm saying is the plan is not the source of the rights conferring provisions. The rights conferring provision is in the CBA. But that rights conferring provision sends you over to the rights limiting provision that's in the plan. And the earlier plans and the later plans had rights limiting provisions. The earlier plans have such provisions? Have rights limiting provisions. Then you have the ones about the contributions? No. No. They do not, Your Honor. They do not. The later plan has a number of differences. One, it has the no vesting provision. Yes, Your Honor. It has these limiting provisions that you just talk about under 5.1 and 5.2 that aren't in the earlier plan. And then it has the general absolute right to amend, but without the limitation of the collective bargaining agreement, correct? Exactly. There's 8.1. Are there other significant differences, then, between sort of Trunch I, which we talked about, and then these later plans? No. Those are the three big differences, Your Honor. Those are exactly right. And that's why I think with respect to those people who retired under those later plans, I don't see how one could possibly say that it was unambiguous in the employee's favor that there was a vested right that was not affected. Can I ask two other questions? Absolutely. One is, during the pendency of this litigation, there's been no stay, and I assume you've been paying, that the old contribution scheme has been in effect. Is that right? Yes, Your Honor. We have been paying the premiums entirely for the past several years since the district court judgment. I'm just curious about how much of this case is left, because you have people you're only talking about people between 55 and 65. You are certainly. And everybody had to have retired by, what, 2000, beginning of, end of 2003. So we're talking at most about two years. Two points here, Your Honor. It applies not only to the participants. You are right. The people age out of this. But it applies not only to the participants, but also to their eligible spouses and dependents. They age out when their participants would have aged out. So they're still aged out. No, Your Honor, because it's until the spouse attains age 65. That's not what I read. Is that right? Yes. Yes. I mean, that's what I've been told, the way this operates. And so there's one particular person I don't know. I thought it said when they would have turned 65, but we can check that. Yeah. I just wonder how much is really behind this now. There is. And, you know, the thing is, Your Honor, this is not only this case. There's a follow-up case in the district court of the people who were carved out of this case in the class search stage. This case is just about premiums, the one before you here. There's another case where people claim that they paid out-of-pocket medical expenses, and they were taken out of this class because the district court expressed some concerns about, gee, is that really a class-wide issue, because you might have individualized relief, like, you know, John Smith might have gone and paid this much to the doctor. This case was those people were pulled out, but there's a case called Green on the docket in Arizona that is kind of waiting in the wings for this case. I understand. And, of course, this case has the backward-looking benefit, the backward-looking premiums components. They are alleging as damages that we pay. I understand. But second question. Any other questions before we have you sit down? We'll give you some time for rebuttal. Okay. I have one more question. The – this plan provides that I think in all of its – or this collective bargain plan provides, I think, in all of its variations, that the employees – the retirees are to get the coverages that they are entitled to at the time they retire. They – what it says, Your Honor, is that they get the coverages to which they were entitled when active employees. Right. And the way that these plans work is they each – the CBA's work is that each CBA supersedes the prior CBA, and – but once you retire, of course, you are no longer covered by the CBA. So I'm just wondering why, given that, in other words, why can't – this is a completely different approach than the earlier opinion took or anything else, and maybe there's something fundamentally wrong with it, but it seems to me that one way of looking at it, because the measure is what was their coverage when they retired, why isn't that just the end of it? In other words, they kind of freeze at that point, and anything that happened in any of the plans after that or anywhere is just irrelevant to them, because the measure is not what the active employees are getting, which is in many other plans, which is usual, but instead what they would have gotten as active employees at the point that they retired. And even if there was a reservation of rights clause that would have allowed a change, no change was made up until the point that they retired. And why isn't – why aren't they – why aren't they frozen at that point? Well, because, again, the question is, were the rights vested? And I think the – you don't get a vested right if you get it subject to this all-this-been-said. I find the word vested distracting. There's a contractual obligation stemming from the language in the CBA. Whether it's vested or not, I don't care. But I do care what's in the contract. Sure you are. And I have exactly Judge Berzon's question when the CBA says, continue to provide the comprehensive medical coverage for which they were covered while active employees. Whatever they were entitled to, they continue to be entitled to. That's how I read that language. And you might do something different for people who retire later, but this is what they get when they retire, and they get to continue it during the period of their retirement until 65. But, Your Honor, again, if you look at that, then it says you go to the – the coverage is – what are those coverages? The premium, the rights conferring provision that they're relying on is in J1, which, again, when that is subject in J5 to what's in the plans, the package that you're getting is the – Well, first of all, it wasn't with regard to the first two sets of collective bargaining agreements, right? Well, it always was, but then the – the – the – Sorry? It wasn't? I'm sorry.  With respect to the first two sets, then the plans were – But this says you are – so I understand that if any change had been made before they're retired, there may have been a reserved right to do that. But once they're retired and they're entitled to the coverage when they were active employees, the same thing they were getting when they walked out the door, why does that – why do they – why do they still get to change it? Because, Your Honor, you are assuming, with all respect, that when they walked out the door, they had a vested right in a lockbox as a result of that. But when you look at it – Well, I'm not only assuming that. I'm saying that's what it says. And – and – and therefore – I mean, I think in many of the other cases – I don't know about all of them, but in many of them, the – the referent was to what the active employees at the time of any particular payment of benefits is. But that's not what this agreement says. This agreement says that they're entitled to what they would have gotten when they were active employees. So the fact that – that there were changes afterwards just seems totally irrelevant. Right. So you look at – they're an active employee until the day they retire. So at that point, you look at – at what is their bundle of rights. The right that they have to the payment of premiums is always subject to the plans, because it – it says there, right in J1, which is the premium provisions, the employer will pay premiums for the coverages subject to A1, which always says everything here is subject to the plan. So in effect, you – they're saying, we will give you – this is a classic situation of all these cases where you have a durational provision on the one hand for life until age 65, and a reservation of rights provision at the same time. And I think what – what you are suggesting is, well, gee, you have a durational provision. The reservation of rights itself doesn't defeat the durational provision because you haven't yet exercised that. I'm not talking about a – see, I'm not talking about a durational provision. That's the point. Well, you're talking about – I mean, there is a durational provision as well, but I'm talking about the substance What is the substance of whatever it is that you have for whatever period you have it? Right. We will pay – you have to combine it two things. You combine D1, which says you get the coverage for – that you were entitled to as an active until 65. Then you say, well, what is the coverage I was an active? Then you go to J1 and say, we agree – the employer agrees to pay the premiums for the coverage. But this, again, is always subject to the reservation of rights. That's the – you didn't get that free and clear. The basic point here is the point that many courts have recognized, that a provision that says you get benefits for life or until age 65, when you get that along with something that say the employer reserves the right to alter or amend the benefits, you didn't get a vested benefit. I think what you're – what you're saying is basically if you got a right, it's necessarily a vested right, which can't be taken away. I'm not – I – well, my question is whether one could and should read this. I guess this is what Judge Fletcher was saying. It's not dealing in rights at all. It says just specifically that what you get is the coverage you got when you walked out the door, period. And it's a measure of what it is you're entitled to. So you don't have to go anywhere else to find out what you're entitled to because it says what you're entitled to, whatever you were getting the day you left. Right. But it says right there on that same page that you're referring to, Your Honor. You're referring to J1. A few lines down, it says all benefits are subject in every respect to the plans. Okay? And so what you're getting is not a just you're entitled to this right. You're getting it – you're getting it subject to the plans. I have one last question. Go ahead, and then I have one more question before you sit down for a while. My very last question is at the end of your brief, I guess my question is what do you want at this point? Do you want to – because at the very end of your petition for rehearing, you suggest that we shouldn't grant summary judgment to either of you, we should send it back. And I can't tell whether you think we want a trial or what is it that you think we should be doing. Your Honor, I think you should reverse the judgment at the very least, which granted summary judgment and thereby under Bauer and under Poore, this Court's precedents, say that to warrant summary judgment, it has to be unambiguous in their favor with respect to everybody. Okay? I think at the very least, we think you should affirm the judgment and say that the plans make it clear – when you look at the combination of the plans and the CBAs, we have an unambiguous, so we should get a judgment as a matter of law. If you disagree with us, at the very least, we think that it's unambiguous with respect to people who retired under a combination of the plan, the CBAs, and the later plans. But when we were in our petition for rehearing, it is certainly true that we said it was frustrating that a lot of – this Court at that point could have taken – an alternative we were offering to the Court was to say, look, you can take a very minimalist approach to this case and just say the district court got the basic approach wrong, because the district court's whole analysis to this case was to say, I'm not going to look at the plans. I think this is only a CBA case. The CBA can't override the plans, and the district court missed the bridge from the CBAs to the plans. Well, we look – we can affirm on any ground. And so when we look at it together and we see that it's a package of the CBA plus the plan, then the question is, putting those two together, is it ambiguous? Or if it's not ambiguous, where does that leave us? If it's ambiguous and we don't have – I assume what you're saying is that there's potentially extrinsic evidence. Yes. Each side, of course, likes to spin that its own way, but we haven't really – that's not really in front of us, per se. Absolutely not. The district court specifically said that it did not consider the extrinsic evidence. That's at ER41. And one important point, the district court here, discovery was conducted after the district court had decided the motion to dismiss that we had brought in the very first instance, and we brought a motion to dismiss based on the reservation of rights provisions and the plans. The district court at that very preliminary stage of the litigation, before any discovery, said the plans are irrelevant. So there hasn't been any discovery or any extrinsic evidence that focused on the roles of the plans and exactly what that provision that says except for that sends you back in the earlier plans means. So with the Federal – Well, that's what was my question. If you go to the later plans, 99 and 2003, and you get through the absolute right to amend, and then you get into the no absolute right, it then gives you an except clause. Except is provided under a benefit program. I don't mean to interrupt. Is the benefit – is the CBA a benefit program? Absolutely not, Your Honor. And that's – the benefit program there is capital B, capital P. That is a defined term in those later plans in section 2.3 of those plans. Go to appendix A. Go to appendix A. You're absolutely right. And the CBA is not there. And apart from the CBA, are the medical benefits a benefit program under appendix A? You know, I don't have appendix A in front of me. I think appendix A is basically the plans, the employer funded. If the CBA isn't the benefit program with regard to the medical plan, at least to some degree, what is? Well, the employer – Where are you getting that? The dental plan, the comprehensive – there are a variety of benefits. But the CBA is a part of a different plan. Life insurance. Life insurance. There's a bunch – there's several of them. I understand. But with regard to the medical plan, which is listed, the retired medical plan is listed. Right. Where is it if it isn't in the retiring health plan? Where is it if it's not in the collective bargaining agreement, at least in part? But again – well, what it says – I recall there's a definition of benefit program. Yes, there is, Your Honor. There's a bunch of things that it could be, which is basically anything that touches on it. Right. But it doesn't include the CBA. And I think the plaintiffs have consistently, in quoting that provision, the no vested right provision in bold, they have just inserted the CBA as if it were a capital B, capital P benefit program. And I think that has to be kept in mind. And I'm going to have you sit down. We've given you, of course, pretty extensive time. We'll give you some time for rebuttal. But let's hear from the employees. Your Honors, may it please the Court. From the outset, I wanted to remind the Court why we're here today. According to the Raytheon's petition brief, the basis for their argument is that this Court's decision in affirming the motion for summary judgment was contrary to the Ninth Circuit's decisions in the Pisciota and the Sinelli cases. Those cases are factually distinguishable from this case. Neither of those cases involve collective bargaining agreements. In fact, the Pisciota case involves salary employees. Does this plan, by the way, the plan, not the CBA, also cover salaried employees? My understanding is that it does, that it's salary and hourly. However, the collective bargaining agreements obviously are for the hourly union employees only. So, for example, the reservation of rights clause is applied to the non-salary employees, wouldn't have the caveat that appears in the – would not be applicable. And therefore, so with regards to the salaried employees, the issues may be entirely different. Correct. And that's the distinction and the importance of that provision, except as provided for, and I wanted to correct the language in which counsel said, an – or an agreement with a collective bargaining agent. There actually is any agreement with a collective bargaining agent, and I can't think of a more consummate agreement than a collective bargaining agreement itself. But the question, you know, in a way it's just circular. So that raises my question as to whether it really is ambiguous, because you have a reservation of the right to amend, except as provided by any agreement. Well, what – except as to what is provided, except as to whether the collective bargaining agreement specifically says you cannot amend, or except as you have certain contractual proffers. I mean, there's two – there's two different ways to read it. And my question would be, well, what does it really mean? The former argument is the argument advanced by appellants, and that is, because there's a reservation of right provision that has the provision except as provided in any collective bargaining agreement, appellants state, well, the collective bargaining agreement does not say that we can't use the reservation of right. That's not the correct reading of that. The correct reading of – and the importance of that provision, except as provided in any collective bargaining or collective agreement with a collective bargaining agent, is found in the CBAs themselves, in Article 13, Section D1, in which it states that employees who hereafter retire and their dependents and their spouses until age 65 will have the same coverage that they had while active employees until they reach the age of 65. That's the language that defines the restriction on the reservation of right clause. Was Mr. Landau right about the duration, about whether the benefits end when the employee is or would have been 65, or whether they continue on until the spouse or dependant turns 65? Absolutely, he is wrong. And he cites a litany of cases stating that several circuits, including some cases in this circuit, have propounded that, that because there's a duration provision, that automatically ends benefits at the conclusion of the agreement. But that's not what the question is. If the spouse is younger than the employee, do you – does that spouse get benefits until the spouse turns 65? Yes. In fact, that's what Section D1 says. I think that's what – I think that's one thing you agree on. Yes, it is. And for you that's a good thing, and for him that's a horrible thing. That's correct, Your Honor. Assuming we agree with you. That's correct, Your Honor. That's a contractual thing. I mean, that's just how it's set up, right? Yes. Well, you've made a distinction in your view that Article 13 provides context for how to read this clause, collective bargaining agreement. But you don't have that proviso in the 99 and 2000 claims. So there you basically have an absolute right without any restriction back to the collective bargaining agreement, or at least any specified one. And then you have the no vested right language. Why, in your view, because I assume it is your view, does the result come out the same? How do you explain and give meaning to the 99 and 2003 plans? Let me answer that in two parts, if I may, Your Honor. The first part is to address what was raised earlier on questioning, and that is whether or not the 2003 plan is relevant to these proceedings. It is not. The collective bargaining agreements we're talking about here and which conferred the rights for purposes of this case were the 1990, 93, 96, and 1999 CBAs. The 2003 plan changed all that going from July 1st, 2004 forward. But it's not relevant to the rights conferred within the previous CBAs. Well, just to be clear, the 99 plan seems to have the same thing. So let's see. And you're correct. Depending on how this comes out, you can work out whether people are eligible under the 2003 plan. But the 99 plan is distinct from the earlier plans. And that's correct, Your Honor. So let's focus on that particular plan. You're correct in stating that that plan removed the proviso in the 94, 97 plans, except it's provided in any agreement with the collective bargaining agent. What it did say is that this reservation of right was restricted to employees with a capital E. Employees is defined in the plan. And it's for those who are receiving compensation from the company, clearly not retirees. And so that's one of the things. Is that the right to terminate or is that the right to amend? Right to terminate in whole or in part. Okay. But that's separate. Okay. I mean, now you've added another player to the table here. The right to terminate has this distinction between employees, which would appear not to cover retirees, but that's a termination, not an amendment. Don't you see some difference? Well, Appellant has made the argument that the removal or elimination of company paid benefits was an amendment only, not a termination. We disagree. Benefit that had been provided to the employees since at least as early as 1972 and removed effective July 1, 2004, that's a termination. Well, they were continuing with their coverage under the plan, correct? It's a question then of who pays for that coverage. That's correct. So their coverage under the plan wasn't terminated. Correct. It's, as you said, who pays for it. That's very significant in light of preexisting conditions and that sort of thing. Yes. And while we're on the subject of contributions, counsel made reference to Section 5.1 in the plan. 5.1 is unavailing for several reasons, and I just wanted to. 5.1 was only in the later plans, is that right? That's correct. And why is it unavailing? In Section 5.2, I think. Well, he made reference to 5.1 and 5.2, but the language I wanted to address is within Section 5.1 it says, Different contribution rates within a benefit program may be established for certain classes of participants. Another clarification, the retiree medical benefits program is one of those such benefit programs that's clearly spelled out in Appendix A. There's no doubt about that. What is a – unfortunately, the definition of benefit program, as it appears in this, in the excerpts of record, is cut off, so I can't – it would have been nice if somebody had put in the excerpts all of some of these plans rather than just pieces of it. So on page AR165, there's a definition, And benefit program document then goes on about the terms of the – but it doesn't finish. I don't know what – what's the rest of it? What is the definition of benefit program document? As it states there in 2.4, Article II, a benefit program document means insurance policy, company policies, the summary plan description. Or other documents governing the terms of the benefit program, including but not limited to the benefits provided, the conditions of – and then it stops. I don't know what it says. And it says, And conditions of benefit payments and claims procedures under each benefit program as amended from time to time. And in your view, that would include the collective bargaining agreement as the source of the company policy or written document that describes this program. Is that what you're saying? That's correct. And on another point brought up by counsel concerning – If it weren't there, is there anywhere else where there's a description of the retiree health insurance plan in any detail? Any other source besides the collective bargaining agreement? No. Other than extrinsic evidence, which for purposes of this proceeding and in the district court it was determined that that was not necessary for coming to the conclusion that the CBAs were clearly and unambiguously provided benefits. So the extrinsic evidence does discuss that. But we have extrinsic evidence. We're kind of hard-pressed, given the record, to launch out with the extrinsic evidence, aren't we? I mean, given the State that it came to us on. The extrinsic evidence was attached as exhibits in support of the applese brief, because in the event that the court found that the contracts, the collective bargaining agreements, were not clear, unambiguous, the court would have the right to look to extrinsic evidence. The district court didn't feel the need to do that. But that's not all the extrinsic evidence. It's the relevant extrinsic evidence that came out below. In your view. Yes. But I think that the three letters that were referred to by Judge Fletcher are quite compelling in terms of making it very clear that employees, now retirees, and their spouses would continue to receive the same coverage, company-paid, until age 65. That's pretty straightforward. The ultimate hard question to me is if it has taken us one hearing and now we're having now a second hearing and we're all, I mean, it's a rather morass of cross-looking pieces of paper, why shouldn't this, as in Bower v. Bunker Hill, just go back for a trial? Because, Your Honor, appellees feel that this is a very easy case. The language of the case is that it's not ambiguous. And a lot of the time, it's not. And what I think is an interesting point about this, as I think it's a good point, is that it's not the only case that applies. Sure. I think the starting point for that is the collective bargaining agreement. And we can talk about subordination provision in a second and engage in a little bit of circular reasoning that's adopted by the appellant. But I think the starting point is the collective bargaining agreement under the retiree employee, retiree medical benefits discussion. And what it says in Section D-1, that retirees will continue to receive the same benefits that they receive while active employees. Well, it says coverage. And there's this, you know, lingering question about whether coverage and benefits and contributions are all the same thing or different things. And then, but in the same section, D-5e, and this is in the 1999, it was changed into the 1996 collective bargaining agreement. Let me find that, if I may. You're now on 1999? This is the, yes, the 1999 CDA. This is ER-141. In Article 12, Section D-5e, it states in entirety, there is no weekly premium slash charge for the preferred plan, the Hughes Medical Plan, or an HMO. Those are all the coverages, incidentally, that were being provided to retirees. And the point is. And that's Article. Article 12. Let's see. Let me make sure that we're in the. That is the 1996 CBA. I'm sorry. I was just going to say, it's not in the 1999. It begins in the 1996 CBA, but then it's repeated in the 1999 CBA. And that's over on ER-153. Isn't it more likely that coverages means whether they're paying for their family or just for themselves or just for their spouses and so on? Unfortunately, coverages is not defined anywhere in the plans in the collective bargaining agreements. However, we can deduce what the parties, or rather Raytheon, because they're the ones who drafted the plans, meant when they referred to coverage. Coverage is used in the context of what specific type of medical plan, point of sale service, HMO, PPO, will be provided. Coverage addresses the type of plan. As to. Also this other characteristic, but does it encompass the question of the contribution? No, it does not. The plans are void of. Then you've kind of shot yourself in the foot, haven't you? Then you're into the question that that's precisely what can be changed. Well, I'm not sure. That is to say, D-1 says continue to provide coverages, comprehensive medical plan coverages. And then 13-J-1 says employer agrees to pay the premium that is for the employees. And then J-2 for the dependents, for the comprehensive medical plan. So provide sounds to me, when I go to 13-J, means payment as provided in J-1 and J-2. And benefits in that section, as in J-5, appears to refer to that which is provided by the plan in terms of benefits for reimbursement for procedures. So I would read the word provide in D-1 to go along with the obligation that's undertaken to pay that shows up in J-1 and J-2. If that's the case, then under the 1999 plan, it tells you that you have the absolute right to amend any benefit programs. And benefit programs includes the retiree medical benefits. So then you're right back to saying you have the right to amend any benefit programs. And if that doesn't mean that you can make the amendment, then why wouldn't it at a minimum be ambiguous? Well, it says that they can amend any benefit program except as provided for in a collective bargaining agreement or an agreement. No, I'm under 1999 now, not under 94, 97. Okay. And in the 99 plan, you're referring to section? Well, section ER-169, which is, let's see, 1999, which would be in 8. It's 8.2, Your Honor. Amendments are always under the 99. Yes, it's in 8.2. And if I can read the language that Your Honor is referring to, it says the company reserves the absolute and unconditional right to terminate the plan and any and all benefit programs. And admittedly, one of the benefit programs is the retiree medical benefits in whole or in part with respect to some or all of the employees. Okay. But that's the terminate. The right to amend is 8.1. Okay. And this is a different benefit, which isn't doesn't have that same restriction as I read it. Again, I've read so many of these, so I'm happy to be corrected. 169. And again, well, if I may, the right to amend, this is referring to the right to amend the plan. And any or all benefit programs incorporated in the plan, which sends me to, I think, Appendix A, which sends me to the retiree plan, which in your view is the CBA. Is it within the CBA? Yes. And I think that's where we get caught up in a bit of semantics. The argument from counsel is that the elimination of company-paid medical benefits is nothing more than an amendment to the retiree medical benefit program. Well, they haven't terminated medical benefits for retirees, have they? They've terminated the company-paid program. That's not terribly satisfying. That really is slicing it. I mean, it seems to me what they terminated or what changed, what altered was who pays for it, but they still got the benefits. They still got coverage, if you will, and benefits. But you don't get it paid for under at least Raytheon's view. And that's correct. The coverage is continued, but the ability of the retirees to elect those coverages was significantly changed by virtue of the fact that now what they had planned and retired on, the promise in writing, in the contracts and in other letters that were sent after retirement, was no longer valid. Yes. And then we're into extrinsic evidence. I mean, the real one real issue I have here is somewhat what Judge Berzon said, is we're, we read this until we're blue in the face, and we have two somewhat reasonable positions advanced here. Maybe one is legally right. I don't know. But it's not, certainly not crystal clear how we get to either side's position. You know, I hesitate to say this, but it does seem to me, I'm afraid, still fairly easy, that is to say, the employer, I'm not just reading D1 of Article 13, agrees to provide the comprehensive medical plan coverages. Now, comprehensive medical plan is capitalized. And we all understand that medical plans change somewhat from year to year. I mean, I'm on the UC Berkeley or UC University of California plan. And every year I get in all these mild modifications. The co-pay goes up or down, or this or that. And so long as it is the comprehensive medical plan, they agree to provide that coverage. But the comprehensive medical plan may refer to a slightly different plan from one year to the next. So all these talk about we can modify the plan. Well, of course you can modify the plan so long as it remains the comprehensive medical plan. That doesn't change anything with respect to who's going to pay for it. Who's going to pay for it comes out of Article 3, J1 and 2. And you're absolutely right, Your Honor. Raytheon reserved the right, and they exercised that right effective July 1, 2004. Going forward from that point on time, in time, they had amended or terminated, however we want to look at it, the retiree medical benefits program. But the other thing is, and I think this is what the original opinion was trying to get at, is that, as Judge Fletcher says, I mean, the precise benefits, whether they're paying for, you know, this week for cosmetic surgery or not paying for cosmetic surgery or paying, you know, X amount for paying a percentage for prescriptions or a flat rate for prescriptions or what the copay is and all that tends to wander around in most of these plans. And it seems unlikely that they were freezing that, and there really isn't any language freezing that. There's language arguably freezing the coverage and the payment, but not really the precise benefits being paid. And that would explain the right to amend as well. Well, one of the problems with that, I mean, I don't know the answer, but there's no definition of coverage. So we've given one that we understand based on our plans, you know, because we all think about our own medical plan. But what, in your view, is there a difference between coverage and benefits here, or are they coextensive based on definitions or reading of the plan? There is a distinction. In fact, if I could refer, Your Honors, to Section J, A3. And I'll just read the beginning portion of that paragraph. It says, Effective January 1, 1992, and this is ER 119th. Effective January 1, 1992, employees may elect different levels of benefit coverage. And that same language is perpetuated in later contracts. Clearly, benefits are different than coverages. If it were not the case, then it would have read differently. In fact, the summary plan descriptions that accompany the plans use the language that the company reserves or that this plan addresses policies, provisions, benefits, coverages. So in the company-provided documents and in collective bargaining agreements, the parties consistently agreed that benefits and coverages are two different things. Do you agree that the ambiguity, if any, becomes much more pronounced when the 99 plans go into effect? Certainly, the 99 plan differs from its predecessors. But again, the language there is that the right to amend or modify or terminate is with respect to employees. And I think that's the case. Kagan No, it's not to terminate, but not as to the right to amend. Well, let's see, I guess, administer or any other interest to employees. Do you think the right to amend is also limited to employees? No. 8.1 is not cast in the same language as 8.2. However, I think the key point is that, yes, effective July 1, 2004, and going forward, Raytheon had effectively invoked that provision, 8.1, and amended the benefit program, retiring medical benefits. However, that change, July 1, 2004, does nothing to prior benefits under collective bargaining agreements that had long since vested. You know, here again, the word benefit means something different depending on context. You referred us to Article 13, Section J. As I read Article 3, Section J, benefit there refers to the payment made under the plan to the service providers. If you look at Section J5, all benefits of employees, da, da, da, da, da, with respect, are subject to all benefits of employees, retired employees, da, da, da, are subject in every respect to the terms of the applicable payment under which payment is claimed. Payment and benefit, there are the synonymous terms, but this is not payment by Raytheon or by the employee or retiree. It's payment to the medical provider. So benefit doesn't mean the same thing as you're moving from one context to the other. It means something quite precise here in Article 13. And there's no doubt that there isn't a clear definition of benefit in the plan or in the collective bargaining agreement. Although the plans do define benefits, if we want to refer to the plans, 2. Article 2, 2.5, benefits means any payments or services made under the plan. Yeah, that's right. That's the way it's used in Article 13. Yes. Okay. Well, I think we have your argument pretty well in mind. So thank you for your argument. And you have two minutes for rebuttal. I do want to say, even before the rebuttal, that the briefing is very well done here. So obviously, we've been through the briefs. We've been through the petitions for rehearing. And I think both the arguments and the briefing are of top quality. We wish the answer were as fluid as your arguments. Thank you, Your Honors. I have one question and then we'll give them extra time. I gather in the district court you took the firm position that this is surmised, maybe wrong, that the reservation of rights clause did not allow the alteration of medical benefits, contributions, or anything else for active employees during the term of the collective bargaining agreement. Yes. Raytheon did take that position. I'm sorry? Yes, Your Honor. That was the position in the district. How can that be? I mean, I don't – I mean, I would find it very disturbing to think that it could change it, but it seems to me that if you are really taking this reservation of rights clause literally and disregarding the Renoir back to the collective You have to take the position that despite the fact that this was collectively bargained with regard to active employees, the employer could just change it. That wasn't based on these provisions we've been discussing. It was based on a different provision, the maintenance of benefits provision, Article 19, Section D, which applies to employees and says no employee shall suffer a loss of any benefits or privileges previously enjoyed as a result of this agreement. I'm not sure this was the relevance of that. I don't either, Your Honor, frankly. I don't know that that – So you think – so you're suggesting that, in fact, this reservation of rights clause, you know, would allow an employer who has negotiated a collective bargaining agreement and promised to provide benefits during a certain period to just eliminate them? I don't think that the plan and the CBAs put a limitation on that. The LMRA puts a limitation on that because that's the subject of mandatory collective – That has been waived. Well, that's the – the D.C. Circuit has a Southern Nuclear case. What the Seventh Circuit said in the Rockford Powertrain case is, look, that's not entirely clear whether a reservation of rights constitutes a waiver of subject of mandatory collective bargaining. This Court need not cross that bridge, and the Seventh Circuit in the Rockford – Well, except that it would be reading the clause somewhat inconsistently if you read it for all its worth with regard to retirees, but thought that it was, you know, kind of a limp noodle with regard to active employees. Well, again, Your Honor, I think it depends on how the LMRA works, because as the Seventh Circuit noted in the Rockford Powertrain case, answering it with respect to retirees doesn't necessarily answer the question with respect to active employees because of the fact that they're not – the retirees are not – don't have the subject of mandatory collective bargaining. If I could, just very quickly, I wanted to make two very preliminary points, which are the spouse provision that Judge Berzon, you asked about, is specifically on page 116, ER116. It says, For his or her eligible spouse until the spouse attains age 65.  So they attain 25. The 2003 plan does matter. It took effect on January 1, 2003. That's ER171. The 1999 CBA terminated on October 27, 2003. So that's ER159. So there's about a 10-month period where it did matter. Going to the larger point, though, I think that you particularly have talked about, Judge Fletcher, the coverage point. I think it is at least not unambiguous whether coverage includes the payment of premiums. Because, again, before you even get to the Js, you have to start with the Ds. That's where the rights of the retirees are set forth. And it says, The retired employee shall have the right to the same coverage as when they were active. What that says on its face, at least arguably, is – With respect, that's not what it says. The employer agrees to continue to provide comprehensive coverages. The coverages, in other words – Agrees to provide. Provide. Meaning we'll pay for it. And that fits with section – with Article – 13, section J, 1 and 2. Your Honor, I don't see how you can decide what the verb provide means. The verb can't expand the scope of the noun. With all respect, you provide – what is it that you're providing? Coverages. Of course. And the coverage, they're providing the comprehensive medical plan coverages, which, as we've just been over a little bit, they can change a little bit from one year to the next because the plan changes a little bit. But so long as we have something called a comprehensive medical plan or a group of plans that are called that, the employer agrees to provide it. Right. But the question, Your Honor, is what is coverages? Is that including the premiums? Or does that – is that like a cobra? Does it say, yes, you get the coverages, your spouse is covered? That's a verb. Again, with all respect, you don't agree to provide the provision. You agree to provide the coverage. So once you've decided to provide means pay, which makes it very clear to me, at  going to provide. Your Honor, again, I don't think providing coverage, if I say my employer provides coverage for my spouse, I don't think that necessarily answers the question that my employer will pay for that coverage. Again, I think providing – And then what do you do then with Article 13, section J1 and 2, which specifically says the employer will pay for it? Well, that now goes to the active. So in other words, but you don't get to that from the D. D, the only thing the retirees are promised in D is the coverages. J is for actives, okay? And J says we will pay the premiums for the coverages, which actually suggests that, of course, premiums is not already encompassed within the realm of coverage. And it's not the natural understanding of coverage to say – so in other words, I think what that's saying is, yes, in J1 it's saying for the active employees, we'll pay the premiums for the coverage. But all it says in D is you get the coverage. You get the COBRA, is what D is saying. That's a very valuable benefit once you retire to be able to participate in the But that's not – coverage, at least, does not unambiguously include premiums. Thank you. Thank you, Your Honor. I thank the counsel for your argument. The case of Alde v. Raytheon is submitted. Or resubmitted.
judges: McKeown, W Fletcher, Berzon, Cjj